1

| | | |
|---|---|---|
| 10:41:52 | 1 | PROCEEDINGS |
| 10:41:52 | 2 | THE VIDEOGRAPHER: We're on the record |

3 for the deposition of A.J. Loll. The time is 10:42

4 a.m. on February 25th, 2014 in the matter of Timothy

5 Kelly versus Nationstar Mortgage, LLC; Civil Action

6 No. 313-CV-003-11 JAG; being held in the United States

7 District Court for the Eastern District of Virginia,

8 the Richmond, Virginia.

    9 The court reporter is Kendra Rowland. The

10:42:27   10 video is Luis Acevedo. Both are representative of

11 Maxene Weinerg Agency.

    12 If Counsel could state their appearances for

13 the record.

    14 MR. BENNETT: For the plaintiff,

15 appearing by videoconference, this is Leonard

16 Bennettt. In addition, my co-counsel Matthew Erasquin

17 and Dale Pittman are appearing telephonically.

    18 MR. LYNCH: John Lynch, counsel for

19 Nationstar Mortgage.

    20 THE COURT REPORTER: And sir, if you'll

21 raise your right hand, I'll swear you in.

    22 ANDREW JOSEPH LOLL,

23 having been first duly sworn, testified as follows:

    24 EXAMINATION

25 BY MR. BENNETT:

Exhibit 6

8

1   Q.   And --

2   A.   I also contact and discussed the file with

3 Gloria *Filman in our compliance area.  In addition to

4 that, I had a call with *Enrico Valesco regarding an

5 e-mail, I believe in 2010, to Gloria Filman.  And I

6 had a discussion with Crystal Mattox, who currently

10:51:58   7 does our letter validation process for the Welcome

8 letter and the Transfer Of Serviceing letter, as well

9 as the VOD Letter.

10         One other thing I did, I validated with our

11 acquisitions group that our processes have not changed

12 since the last time.  Actually sat and had a hands-on

13 experience watching boarding of loans.  That was about

10:52:27   14 three years ago, and the process did not change.  So

15 I'm very familiar with the boarding process.

16   Q.   And what do you mean by the process has not

17 changed?

18   A.   How we transmit the data from the prior

19 servicer through the secured website and how we load

20 the data into our system called TMO, which then

21 uploads that data into LSAMS, which is our -- that's

22 our servicing/accounting management system.  LSAMS is

23 a servicing platform.  TMO is the mortgage originator

10:53:00   24 platform.

25         So when you board loans, you have to

11

1  Q. Yes.
2  A. That's not accurate. Centex Home Equity had
3 loan referrals from brokers, correspondence. We also
4 had retail and direct sales. So we originated
5 directly with the borrower in the bulk of our
6 business. But we did do some Fannie Mae originations.
7 We did have some referrals from the Centex Home's
8 group.
9  Q. Okay.
10  A. But the bulk of the business was directly
11 with the borrower.
10:56:00 12  Q. And then at some point, it changed its name
13 to Nationstar?
14  A. That's correct.
15  Q. And do you recall when that occurred?
16  A. I believe it was 2005. I'm not -- I could
17 be off by a year or two. I think it was around 2005.
18 The Centex Corporation was trying to, I think, raise
19 capital at the time and sold off a -- or put out --
10:56:26 20 off that part of the business for sale that eventually
21 became Nationstar.
22  Q. And is it today a publicly traded entity?
23  A. That's correct.
24  Q. And when did it go public?
25  A. I don't know the exact date. I believe it

25

```
         1    Q.  What do you understand the violation that is
         2    prosecuted here to be?
         3    A.  I don't necessarily -- I'm not an attorney
         4    or a judge.  So I cannot give an opinion of -- if
         5    there was a violation occur that did not occur.
         6    Q.  What do you understand the allegation to
         7    be?
         8    A.  I think the root cause is whether or not the
11:14:28 9    customer is confused based on the Validation of Debt
         10   letter.
         11   Q.  Well, that's a -- you know, you're not an
         12   attorney.  And will I better phrase my question.  I'm
         13   not normally sure that if someone advised you just on
         14   the side that confusion by the actual consumer is a
         15   factor at all.  I can't imagine Mr. Lynch would
11:14:59 16   represent to you that the claim is that anyone was
         17   confused, as opposed to the potential for confusion.
         18       But the -- in this case the claim that is
         19   being prosecuted is that the Verification of Debt
         20   letter, the FDIC letter, listed a total payment amount
11:15:25 21   and then listed subcategories of that total payment
         22   that did not equal the total payment amount.  Does
         23   that sound familiar at all.
         24   A.  You're saying "payment."  It's the total
         25   debt that is owed, not necessarily a payment that's
```

26

        1 owed.  It's just disclosing to the borrower the total

        2 debt.

        3    Q.  I understand.  The total debt that's owed

11:15:57  4 and the -- in fact, if you want to go ahead and turn

11:16:06  5 to what is in your book, Exhibit 22, the last page.

11:18:14  6 And this is -- you have the letter in front of you?

        7 It's Bates-numbered on the bottom NM/TK 327.  Do you

        8 see that?

        9    A.  Yes, sir.

11:18:31  10    Q.  By the way, do you know what organization

        11 actually put that number on the bottom right?

        12    A.  The NM/TK 327?

        13    Q.  Yes.

        14    A.  No.

        15    Q.  That is what we refer to as a Bates number.

        16 Have you heard that saying before, that expression

        17 before?

11:18:59  18    A.  Oh, yes.  I understand the Bates number.

        19    Q.  Okay.  So this is the letter that's

        20 challenged.  And it says, Your total debt -- in the

        21 first bullet point -- Your total debt as of 10/15/12

        22 is $202,197.64.  Do you see that?

        23    A.  I do.

11:19:28  24    Q.  And then it lists additional amounts.  It

        25 says, This amount includes your outstanding unpaid

32



43



21    Q.  Is Convergence the name; or is it a city; or

22 is it --

11:53:58  23    A.  Convergence is the building -- is the

24 building.  It's called Convergence.  It's still in

25 Lewisville.

52



64



68

1 I'm going to move this real quick and talk to my

12:29:00 2 colleagues because I think I'm towards my end here.

3 Let me just take a minute. As I mute you, you're not

4 muted unless you turn your --

5     THE VIDEOGRAPHER: Off the record at

6 12:29.

7     (Recess taken at 12:29 to 12:31.)

8     THE VIDEOGRAPHER: We're on the record.

9 The time is 12:31.

10     MR. BENNETT: I don't have other

11 questions for the witness.

12     I do understand that we have an

13 agreement in our cases that the read and sign time

14 would come from when the court reporter provides a

12:31:26 15 copy of the deposition to Nationstar's lawyers.

16 Right, John?

17     MR. LYNCH: Yeah. That's fine.

18     THE COURT Reporter: And John, do you

19 want a copy of this as well?

20     MR. LYNCH: The transcript, not the

21 video.

22     THE VIDEOGRAPHER: Off the record at

23 12:32.

24     (End of deposition at 12:32 p.m.)

25